Argued January 25; affirmed March 12, 1935

# HUBBS *v.* WAREHOUSE SERVICE CORPORATION
### (42 P. (2d) 180)

*W. C. Winslow,* of Salem, for appellant.

*Custer E. Ross,* of Salem, for respondent.

BAILEY, J. The plaintiff instituted this suit to foreclose a chattel mortgage given to him by the defendant to secure the payment of $6,000 represented by twelve promissory notes of $500 each, two of which were payable July 1, 1933, and the other 10 on July 1,

1934. The property covered by the mortgage is de-scribed as follows:

"That certain warehouse heretofore erected by Withers, Neal & Jordan and situate on the real property of the Southern Pacific Company in Silverton, Oregon, said property being immediately north of and adjacent to the feed mill and warehouse property of W. E. Loughmiller and southerly from and adjacent to the Southern Pacific railway station in Silverton, Oregon; said property fronting on Water street on the west and on the Fischer spur track on the east.

"Also, that certain lease heretofore executed by Southern Pacific Company to Withers, Neal & Jordan and mortgaged thereafter to George W. Hubbs, trustee, and covering the ground rights to the real property above referred to; also all extensions, renewals and new leases covering said described property and the right to use or occupy the same.

"Also, all tools, machines, equipment and appliances used in or which may be hereafter placed in said ware-house by the mortgagor for the purpose of carrying on its business as a warehouseman."

The plaintiff attempted to reform the mortgage by adding to the property included therein a certain frame-construction wooden building located on the leased property on which was situated the warehouse described in the mortgage.

The complaint was filed September 28, 1933. At that time not any of the notes had been paid although two of them had matured July 1, 1933, and there was unpaid interest at the rate of 7 per cent due on all the notes from January 1, 1932. Taxes for the years 1930, 1931 and 1932 on the mortgaged property, amounting to approximately $568 exclusive of interest, were un-paid and delinquent and there remained a balance of $65 rental due the railroad company on the lease.

The complaint further alleges that the mortgaged property was used for warehouse purposes; that the

defendant was threatening to remove the goods stored therein; that the property was principally valuable as a storage warehouse; that it would not sell for an amount sufficient to pay plaintiff's claim in full; and that the appointment of a receiver was necessary, to preserve the value of the property. The prayer asks for reformation of the mortgage, appointment of a receiver to take charge of and conduct the business during the pendency of the suit, judgment for the amount of principal and interest due on the notes, and the foreclosure of the mortgage and sale of the property covered by it.

The defendant by way of affirmative answer alleges that the property covered by the mortgage was purchased by the defendant from the plaintiff and that the notes given by it to plaintiff were for the balance of the purchase price. This pleading further avers that on or about September 27, 1933, the plaintiff and the defendant entered into an agreement by the terms of which it was mutually understood and agreed ''that this defendant should convey by a bill of sale to the said plaintiff, for himself and the note holders, the property covered by said mortgage, and that in turn the said plaintiff would release this defendant from all liability in connection with said notes and mortgage'' and would cancel the mortgage and surrender the notes to the defendant; that the defendant had fully performed all the terms and conditions of the agreement to be performed by it and was ready, able and willing to complete said transaction whenever the plaintiff would complete his part thereof by delivering the cancelled notes and mortgage; that the defendant had, pursuant to the agreement, ''made and executed a bill of sale so conveying said property and delivered the same'' to a designated bank at Silverton, Oregon, to be delivered to the plaintiff, upon the plaintiff's delivering

to the bank for the defendant the cancelled notes and mortgage. The prayer of the answer is for dismissal of the suit and for defendant's costs and disbursements.

Except as set forth in the complaint, the plaintiff in his reply denies the affirmative allegations of the answer.

After the suit was instituted the circuit court appointed a receiver to take possession of and operate the mortgaged property. Upon the trial a judgment was entered in favor of plaintiff for the full amount of the principal of the notes with unpaid interest, attorney's fees and costs, and a decree for the foreclosure of the mortgage and sale of the mortgaged property was likewise entered. The court, however, denied plaintiff's prayer for the reformation of the mortgage to include other personal property. From the decree the defendant appeals, and assigns as error: (1) the failure of the court to hold that there was a valid contract between the plaintiff and the defendant whereby the plaintiff agreed to accept the return of the mortgaged property in lieu of the indebtedness; (2) the failure of the court to hold that the mortgage was a purchase-money obligation; and (3) the provision in the decree that the money collected by the receiver prior to the decree of foreclosure should be applied on the indebtedness.

Negotiations between the plaintiff and the defendant which, according to defendant, resulted in an agreement whereby the plaintiff was to accept the mortgaged property in lieu of the indebtedness owing by the defendant, were conducted almost entirely by correspondence between the parties to this litigation. The $6,000 obligation of the defendant was evidenced by twelve promissory notes. These were in the hands of several different holders, represented by Hubbs, who had authority under the mortgage to bring this suit in his own name.

In order to obtain a proper perspective and an understanding of the background of these transactions it will be necessary to refer to correspondence between the parties. On August 26, 1933, the attorney for plaintiff wrote to the defendant, calling attention to the fact that no interest had been paid since January 1, 1932; that $1,000 was due on the principal; that the defendant had neglected to keep up the insurance as specified in the mortgage; and that the note-holders had decided that, unless the defendant made good these defaults at once, foreclosure proceedings would be instituted. To this letter the defendant on August 30, 1933, replied to the attorney, stating that the writer of the letter had had a meeting with Mr. Hubbs and had the matter under discussion as to the practical method of working out the situation.

On the same day the defendant wrote to Mr. Hubbs, submitting three propositions, the first of which was that the defendant would execute a bill of sale transferring the "tile warehouse" property back to him as trustee for the note-holders. As incidental to this offer Mr. Hubbs was to surrender the notes and satisfy the mortgage. On September 5, Mr. Hubbs wrote to the defendant stating that at a meeting of the note-holders "they decided that for the best interests of all concerned they would take over the warehouse on which they hold a mortgage" and that he would call a further conference with the note-holders to effect arrangements for the defendant's employee in charge of the warehouse to give up possession to them.

Later, in an undated letter received by the defendant on September 8, 1933, Mr. Hubbs wrote that the note-holders had instructed him to request that the defendant "turn over the warehouse here in Silverton to them at once, if it is your intention to turn it over to them as suggested"; also, that the defendant's agent

in charge of the property had stated that it was necessary to make repairs on the roof immediately, to protect the hops in storage.

On September 13, the defendant by its president replied to plaintiff that it did not want him to think that the warehouse corporation was delaying action in the matter, but that it had been impossible to get the directors of the corporation together for, from what appeared in later correspondence, the purpose of authorizing the transfer of the mortgaged property to the note-holders. Then, on September 15, the attorney for the note-holders wrote to defendant stating that it was believed that the company was "stalling along in this matter where there is no good reason for delay"; that the note-holders had assumed that the president of the company in making the proposal had taken up the matter prior thereto with the board of directors and had been authorized to make the offer; that "one of the offers, namely, to take title to the property, was accepted by the interested parties"; and that "this acceptance has not been met by compliance on your part". It was further stated that "unless you promptly and without further delay make this transfer of title, action will be instituted to foreclose on the mortgage" and if the property should not sell for enough to pay the full amount due, "a deficiency judgment will be taken against your company". In reply to that letter the company wrote on September 18, protesting its good faith and stating among other things:

"It is necessary that we have a definite understanding with the note-holders in regard to the hop storage now in the warehouse. Our responsibility under our warehouse receipts must of course be fully protected and also the interests of the depositors must be protected. We have three suggestions to make in regard to the storage accounts."

The letter then set out the three propositions, one of which was that the defendant would sell to the note-holders the storage accounts and transfer to them the hops in storage.

On September 19, the attorney for the note-holders or for Mr. Hubbs wrote to the defendant in answer to its letter of the preceding day, stating that the note-holders were not interested in the course to be pursued by the defendant in reference to the storage goods and calling attention to the fact that taxes had not been paid; that the property was being used by the defendant "rent free, tax free and interest free"; and that the note-holders "must have some action and have it promptly", or foreclosure proceedings would be instituted. The letter further stated that it would be agreeable to the note-holders if possession be turned over to them at once, subject to defendant's right to have a man in charge to look after the stored goods, but that it was necessary that some action be taken promptly. The letter ended thus: "There is no need of your writing letters to me or, for that matter, writing letters to any one. We desire and are insistent upon prompt action being had with reference to this matter."

Next, on September 21, the defendant wrote to the plaintiff the following letter:

"We have bill of sale to the tile warehouse at Silverton ready to deliver to you upon delivery to us of the outstanding notes and satisfaction of mortgage. If you do not have these notes in your possession, will you kindly get them so that we can make the transfer at the earliest possible date. I await your advice in this respect, and will probably come to Silverton to make delivery and pick up the satisfaction. In case I can not come, I will send the documents to the bank at Silverton for delivery immediately upon hearing from you."

The plaintiff on the following day, but apparently before receiving defendant's letter of September 21, wrote to defendant as follows:

"Mr. Ross, attorney for the note-holders, has instructed me to advise you that said note-holders are ready to take your warehouse over in Silverton as of October first, and that Wm. Scarth & Sons will have charge of the warehouse and will issue warehouse receipts for the hops stored therein as fast as you are released from the warehouse receipts you now have out on said hops."

This concludes the correspondence between the litigants. Six days after the letter last above quoted was written the suit was filed, and on the same day the defendant sent to the bank at Silverton a bill of sale for the "concrete-tile" warehouse with instructions to deliver it to Mr. Hubbs upon the surrender by him to the bank of the cancelled notes and mortgage. The property described in the bill of sale was the following:

"That certain concrete-tile warehouse building situate on the real property of the Southern Pacific Company in Silverton, Oregon, said property being north of mill and warehouse property of W. E. Loughmiller and southerly from the Southern Pacific railway station in Silverton, Oregon, and fronting on Water street on the west and on the Fischer spur track on the east."

There is some testimony that on September 29, after suit had been instituted, the bank notified the plaintiff that it had in its possession this bill of sale.

The real property on which the warehouse involved in this litigation is located is owned by the Southern Pacific Company and at the time of the negotiations herein referred to was leased by that company to the defendant at a rental of $90 per annum. The lessee warehouse corporation covenanted not to sublet or assign the lease without written consent of the railroad

company. From the entire record it is apparent that in the negotiations looking to a possible transfer of title, the parties thereto had in mind all the property covered by the mortgage, which not only included the warehouse but the lease and all tools, machines, equipment and appliances on the premises used by the defendant company in its operations. The railroad company might not recognize an assignment of the lease by the warehouse corporation, yet it probably would not enter into a new lease with the note-holders while the other lease was in existence. Without a lease from the railroad company, the property covered by the mortgage would be of little value to any one.

After a settlement had been attempted for some time between the plaintiff and the president of the defendant corporation, on the assumption that the president had authority to act on behalf of the corporation, it developed that the proposals submitted by him had not been authorized by the corporation's board of directors. Under date of September 13, Mr. Hubbs was notified by the president of the corporation that he had been unable to have a meeting of the directors of the corporation to pass upon the terms of settlement suggested by him. On September 18, all dealings between the parties were further complicated by the defendant's stating that some definite understanding with the note-holders must be had in regard to the hops stored in the warehouse before the property could be transferred. No agreement, however, was thereafter effected between the parties as to what should be done with the stored hops, which amounted to over 3,000 bales on September 29, when the property was turned over to the receiver.

During the negotiations there was preserved a clear distinction between the transfer of the property from the defendant to Hubbs and actual delivery of posses-

sion. The note-holders through Mr. Hubbs in their negotiations with the defendant were asking for performance and not promises on the part of the defendant corporation. They were not attempting to substitute the promise of the defendant corporation to transfer title to the property for its promise to pay its obligations. They were willing, if the company acted promptly, to accept the mortgaged property in satisfaction of the company's indebtedness to them. When the company, on September 18, wrote to the plaintiff stating that it was necessary to have a definite understanding as to the disposition of the stored hops, it thereby rejected any offer which had prior thereto been made by the note-holders: *Shaw Wholesale Company v. Hackbarth*, 102 Or. 80 (198 P. 908, 201 P. 1066) ; Restatement of the Law of Contracts, Vol. 1, §§ 58 and 60.

The defendant's letter of September 21 did not amount to an assent to any certain proposal submitted by the note-holders. It did not refer to the time when possession of the property should be delivered to the plaintiff. The plaintiff was under no obligation either to consent to or reject the proposal so made by the defendant. The letter of the following day from Hubbs to the defendant, which does not appear to be in answer to that letter from defendant, suggested October first as the date for delivering possession of the warehouse and further indicated that Wm. Scarth & Sons would have charge of the warehouse and issue receipts for the hops there stored as fast as defendant was released from its warehouse receipts. The defendant never assented to this disposition of the matter.

The bill of sale was mailed to the bank on September 28, the day that suit was filed and a receiver appointed, but the record fails to disclose whether this bill of sale was mailed before or after the defendant learned of

the institution of the suit. Moreover, the bill of sale did not cover all the property included in the mortgage.

■ The record does not show any contract whereby the plaintiff agreed to satisfy the mortgage indebtedness upon the agreement of the defendant to transfer the mortgaged property to the plaintiff or to the noteholders. Nor is the evidence sufficient to prove that the defendant complied with any offer made by the plaintiff to satisfy the indebtedness upon the transfer of the mortgaged property to him. Stated differently, there was no contract whereby both parties were bound to do or perform certain things, nor did the defendant comply with any offer made by the plaintiff. In the case of *Shaw Wholesale Company v. Hackbarth,* supra, this court quoted with approval from 1 Williston on Contracts as follows:

"In order to make a bargain it is necessary that the acceptor shall give in return for the offerer's promise exactly the consideration which the offerer requests. If an act is requested, that very act and no other must be given. If a promise is requested, that promise must be made absolutely and unqualifiedly. This does not mean necessarily that the precise words of the requested promise must be repeated, but by a positive and unqualified assent to the proposal the acceptor must in effect agree to make precisely the promise requested; and if any provision is added to which the offerer did not assent, the consequence is not merely that this provision is not binding and that no contract is formed; but that the offer is rejected.

"The new condition is as fatal when its inconsistency with the offer appears by implication only as when it is explicitly stated. Thus when an offer is made by mail to sell stock, a reply in terms accepting the offer, and adding 'ship with draft attached' adds a new condition since by implication the place of delivery under the offer was the seller's residence, and the reply transfers it to the buyer's."

■ The subject of the mortgage in the instant case was personal, and not real, property. In addition to the mortgage, notes were given evidencing the indebtedness and it became the duty of the court in the foreclosure proceedings to enter judgment against the defendant for the full amount due on the notes: § 6-501, Oregon Code 1930. Section 6-505, Oregon Code 1930, relied upon by defendant, applies only to suits for the foreclosure of mortgages on real property and hence has no bearing here. The trial court, therefore, did not err in holding that the plaintiff was not limited in this foreclosure proceeding to the property covered by the mortgage sought to be foreclosed.

■ Under § 54-207, Oregon Code 1930, the plaintiff was entitled to the immediate possession of the mortgaged property, since the conditions of the mortgage had been breached by the defendant. The mortgage itself provided that upon failure of the defendant to comply with all the terms thereof the plaintiff might bring suit in any court of competent jurisdiction to foreclose the mortgage, and in such suit plaintiff would be entitled to the appointment of a receiver to take possession of and operate the property. The plaintiff proceeded to foreclose the mortgage in the manner provided therein and in accordance with § 54-208, Oregon Code 1930. No error was committed by the circuit court in appointing a receiver for the pendency of the suit, or in applying the money coming into the receiver's possession from the management of the warehouse to the satisfaction of the indebtedness.

The decree appealed from is affirmed, plaintiff to recover his costs and disbursements in this court.

CAMPBELL, C. J., and BEAN and RAND, JJ., concur.